IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                    Case No. 22-10068-JWB-01,-02

JONATHAN OTERO, and
JENAIZ RAMOS,

        Defendants.

**MEMORANDUM AND ORDER**

    This matter is before the court on Defendant Otero's motion to suppress evidence. (Doc. 29.) The motion was fully briefed and the court held an evidentiary hearing on July 18, 2023, making the motion ripe for decision. (Docs. 36, 41, 43.) The motion of Defendant Ramos to join in the motion to suppress (Doc. 30) is GRANTED to the extent the arguments raised in the motion apply to Ramos. For the reasons stated herein, Otero's motion to suppress (Doc. 29) is GRANTED but Ramos's motion for suppression is DENIED.

**I. Facts**

    The court finds the following facts from the evidence presented at the hearing. Deputy Justin Rugg of the Kiowa (Kansas) County Sheriff's Office was on duty on June 9, 2023, running radar from his car parked near U.S. Highway 54 west of Mullinville, Kansas. An east-bound white BMW passed him going 51 miles per hour in a 65 mile per hour zone with several vehicles lined up behind it. He testified that a car traveling that slowly was unusual. After Rugg pulled out onto the highway and followed the line of cars, the BMW exited the highway at the next exit about three-fourths of a mile up the road and pulled into a truck stop. Rugg pulled over and observed the

BMW through binoculars, calling in the license plate to his dispatcher. The BMW sat at the gas pumps for some time, after which a male got out of the car and went into the gas station. When the dispatcher informed Rugg that the tag number was not associated with any vehicle, Rugg called Kansas Highway Patrol Trooper Austin Ackerman to check on his location and to tell him he thought the driver of the BMW was acting oddly.  Both Rugg and Ackerman were certified handlers for drug-sniffing canines ("K-9s") and each had their dog with them. Rugg testified that the "no return" on the tag could indicate a number of things, including that the car was stolen or not registered, that an error occurred inputting the number into the system, or that the computer system was down or slow.

Rugg observed the male from the BMW return to the gas pump and pump gas for only a short period. The man most likely paid cash for the gas inside the store because he did not insert a credit card in the pump. Rugg considered the payment of cash for gas and the apparently small quantity purchased unusual. The car had also backed into the gas pump stall, with the driver facing toward Rugg, although it could have pulled directly into a stall going forward. Rugg considered all of the circumstances indicative of attempts by the driver to avoid the officer.

When the BMW continued east on Highway 54, Rugg followed a few cars behind it. The highway at that point was only two lanes (one for eastbound and one for westbound traffic) but it had an occasional additional eastbound "passing lane" allowing faster traffic to pass slower vehicles. Traffic control signs posted before the passing lane areas directed drivers to "Keep Right Except to Pass." When the BMW came to a passing lane area, it stayed in the left (passing) lane although it was traveling slower than other traffic, forcing a faster-traveling truck to pass it via the right lane. Rugg pulled in behind the BMW and turned on his emergency lights to stop it for a failure to obey a traffic control device (the "keep right" sign) in violation of K.S.A. 8-1507. The

BMW turned on its left turn signal but then pulled over to the right lane and onto the right shoulder to stop.

Rugg stopped behind the BMW and called in the license tag again. Rugg approached the passenger side and spoke to the occupants. All of the windows were down. A female (Ramos) was seated in the front passenger seat, the male Rugg had seen (Otero) was driving, and another female was apparently asleep in the back seat. Rugg explained the reason for the stop and asked Otero for his driver's license and insurance information. Otero produced a registration paper for the vehicle in the name of Noemi Otero in Santa Ana, California, but indicated he only had a California ID (identification) card and had no driver's license. He did not produce any evidence that the car was insured. Rugg had Otero come back and sit with him in the patrol car while Rugg attempted to determine Otero's status as a driver and whether the car was properly registered and insured. When Rugg asked Otero where he was going, Otero said it was to his sister Jessica's place in Kansas, although he did not know where it was, indicating the location was on his phone and that the destination was still "sixteen hours" away. When Rugg asked what he was going to do when he got to his sister's place, Otero said something about being tired and stopping to get a motel room. Rugg called in Otero's ID card information to the dispatcher to see if he had a valid driver's license or any warrants. Otero told Rugg he was practicing for his driver's license but had failed the test multiple times. Rugg asked if anyone in the vehicle had a valid driver's license and Otero said no. Rugg radioed for Ackerman to come to the scene if he was close.

The dispatcher informed Rugg that no record was found on the tag[1] and that Otero had an "ID only" – meaning he had no driver's license. Otero identified the person listed on the

---

[1] It was later discovered that Rugg reported the tag number incorrectly both times he conveyed it to the dispatcher. The tag contained the marking: "VAGO714," but it was unclear from the font used whether the "O" was a number or a letter. Rugg called it in as a zero but it was in fact registered as the letter "O."

registration form (Noemi Otero) as his sister that he lived with in California. Rugg went to look at the BMW's VIN (vehicle identification number) to see if it matched the information on the registration slip. While he was at the BMW, Rugg asked Ramos about her travel. She initially said they were going to see Otero's sister "Michelle," but then said the sister's name was Jessica. She said she did not know what city the sister lived in but that the destination was on the phone, and that they planned to stay for two days. Ramos indicated that neither she nor the passenger in the back had a driver's license. Ramos said she had identification on her phone and proceeded to look for it. Rugg returned to his car and called in the VIN. Ackerman, meanwhile, arrived on the scene with his K-9 Rosko. At that point the dispatcher confirmed to Rugg that the BMW was registered to Noemi Otero in California.

Rugg suspected drug activity based on all of the circumstances. He got out of the car and spoke to Ackerman. Rugg stated that he was going to give Otero a warning and inquire further, including possibly asking Otero for consent to a search. They decided that Ackerman would have his dog Rosko do a sniff of the car exterior while Rugg continued to seek information. Rugg returned to his car and continued filling out a warning citation. He asked Otero if he had anything illegal in the car; Otero said no. Rugg told Otero that he was going to issue him a warning for his failure to move to the right on the highway and for driving without a license. When Rugg saw Rosko indicate the presence of drugs in the car, Rugg again asked Otero whether he had anything illegal in the car, but Otero said he did not.

Before conducting the dog sniff, Ackerman spoke to the two occupants of the BMW, checked Ramos's identification, and had the two occupants get out and stand out away from the car. Ackerman began with Rosko at the rear of the BMW and proceeded counterclockwise around the passenger side. They went around the front of the BMW to the driver's door, where Rosko

lifted up and inserted his snout through the driver's window opening and sniffed the interior airspace of the car near the rear part of the window opening. He then briefly moved his head back toward the front of the window opening, again sniffing the interior airspace with his snout through the opening. Ackerman testified this behavior was an alert by Rosko indicating he had detected the odor of a controlled substance and was trying to locate its source. Ackerman and Rosko completed a circle around the BMW before reversing direction and proceeding clockwise. At the driver's open window, Rosko again lifted up and sniffed inside the window opening before sitting down next to the car. Ackerman testified this was an indication by Rosko that he had identified the strongest point or source of the controlled substance odor.

The officers subsequently searched the BMW. They found a glass pipe with marijuana residue in the passenger compartment. In the trunk, they found a spare tire that did not match the car and that was exceptionally heavy. The spare was a six-lug wheel while the wheels on the BMW had five lugs. They suspected it contained drugs. The officers cut into the spare and ultimately found numerous packages containing a substance that field tested positive for methamphetamine.

Rugg testified about the Kiowa County policy on towing and impounding vehicles. He said that if officers arrest the driver of a vehicle and there are no licensed drivers present, a tow truck is called. He said officers inventory the contents of a vehicle in that situation if they can do so safely and the vehicle is then towed to a lot. He said although the BMW could have been considered legally parked by the side of the road for 48 hours, the county policy was to tow every vehicle without a driver and to inventory its contents.

Rugg testified that driving without a license or without proof of insurance are both offenses for which a person may be arrested in Kansas. Rugg testified he would have arrested Otero if the officers had not engaged in the drug investigation. He further said such an arrest would have

included an inventory search, which would have located the marijuana pipe in the car, and that this discovery in turn would have provided probable cause to search the trunk of the car for drugs and so would have led to discovery of the drugs in the spare tire.

## II.  Summary of Arguments

Defendant Otero asserts that the initial stop of the BMW was not justified and that Rugg then unlawfully extended the stop to pursue unrelated inquiries. (Doc. 29.) He argues Rugg had no basis to detain him to investigate his travel plans or to conduct a dog sniff. Otero further contends Ackerman and Rosko violated his Fourth Amendment rights by searching the BMW, both because the search violated Otero's reasonable expectation of privacy and because the officer and the dog committed a common law trespass when Ackerman "led K9 Rosko to enter his vehicle through an open window." (*Id.* at 18.)   Even if Rosko's entry into the vehicle was not a search, Otero challenges whether the dog's alert established probable cause for a search. (*Id.* at 30.)

In response, the government argues the initial stop was justified because Rugg had reasonable suspicion of a traffic violation. It further argues Rugg had several reasons to detain Otero, including because Otero was driving without a valid license in violation of K.S.A. 8-235, which gave Rugg probable cause to arrest Otero.[2] (Doc. 36 at 15.) As for the dog sniff, the government argues the momentary touching of the outside of a car is not a trespass and that "[t]he same can be said of a drug dog's momentarily sticking his snout *inside* of a vehicle because such a limited intrusion does not harm the possessor's interest in the physical condition, quality, or value of the chattel so as to arise to 'intermeddling.'" (*Id.* at 29-30) (citing *United States v. Acuna*, No. 21-10035-JWB, 2022 WL 30181419, *6 (D. Kan. 2022)). It further argues this did not amount to a trespass search because "it is unclear what, if any information the drug dog gained as a result

---

[2] KSA 8-235 provides in part that no person shall operate a motor vehicle upon a highway in the state unless the person has a valid driver's license. Violation of that provision is a class B nonperson misdemeanor under Kansas law. *Id.*

of the alleged trespasses." (*Id.* at 30.) Additionally, the government notes case law from the Tenth Circuit and other courts finding that a dog's entry into a car was not unlawful where the act was instinctual rather than orchestrated by the officer, and it argues there was no violation here because Defendants left the windows down and Rosko's attempts to get closer to the odor of drugs "was purely instinctual." (*Id.* at 32.) Even if Otero could show a Fourth Amendment violation, the government argues evidence of the drugs should be admissible under the inevitable discovery doctrine. It argues that even if the dog had not alerted, Rugg would have impounded the vehicle and would have found the drugs in the course of an inventory search. Alternatively, it argues the officers would have developed probable cause to believe the car contained drugs in the course of inventorying the car's other contents, such that they would have done a complete search and would have discovered the drugs hidden in the spare tire. Finally, the government argues the officers acted in a good faith belief that their actions were lawful and that the evidence should not be excluded as a result.

### III. Analysis

1. <u>The initial traffic stop was reasonable</u>. An initial traffic stop is justified at its inception if "an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009). When Rugg saw the BMW traveling in the passing lane area, it stayed in the left lane although it was traveling slower than at least one other vehicle – a truck that passed it on the right. The BMW was in the left lane despite a sign directing drivers in this area to "keep right except to pass." Rugg had probable cause under these circumstances to believe the BMW driver violated K.S.A. 8-1507, which generally requires drivers to obey the instructions of traffic control devices. *See also* K.S.A.

8-1442 (traffic control device includes public signs regulating, warning, or guiding traffic).  The initial stop was thus reasonable under the Fourth Amendment.

2.  Detention and officer inquiries until completion of the dog sniff.  "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop ... and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." *Id*. A traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket. *Id*. at 1614-15. An officer can ask questions unrelated to the purpose of the traffic stop "so long as [the unrelated] inquiries do not measurably extend the duration of the stop." *Id*. at 1615 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

"Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Id*. (citation omitted.) Those inquiries typically involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id*. Like enforcement of traffic codes, these checks are designed to ensure that vehicles on the road are operated safely and responsibly. *Id*. *See also United States v. Wheaton*, No. 17-10161-JWB, 2018 WL 4409437, at *3 (D. Kan. Sept. 17, 2018) (citing *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005)) (an officer "conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation.")

"If an officer 'observes specific and articulable facts supporting a reasonable suspicion that [an occupant of the vehicle] is engaged in illegal activity,' the officer may extend the stop beyond

its initial scope." *United States v. Samilton*, 56 F.4th 820, 827 (10th Cir. 2022) (quoting *United States v. Cash*, 733 F.3d 1264, 1274 (10th Cir. 2013) and citing *United States v. Lopez-Martinez*, 25 F.3d 1481, 1487 (10th Cir. 1994) (suspicious behavior by a vehicle's passenger can give rise to reasonable suspicion)). "'Reasonable suspicion is an objective standard,' and we 'inquire[ ], based on the totality of circumstances, whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate.'" *Id.* (quoting *Cash*, 733 F.3d at 1273). The detaining officer need only articulate "some minimal level of objective justification" for the detention and need not rule out the possibility of innocent conduct. *Id.* (citation omitted.)

The court concludes that Rugg's inquiries about the BMW and Defendants' travel plans, and his subsequent detention of Defendants until completion of the dog sniff, were reasonable under the Fourth Amendment. Otero was unable to produce a driver's license (and admitted he did not have one) or proof that the car was insured. It was reasonable under the circumstances for Rugg to conduct inquiries and run checks relating to the vehicle and to Otero's status until he could confirm whether Otero was in lawful possession of the vehicle and whether anyone present could lawfully operate it. Rugg's initial questions to Otero were either related to the mission of the stop or did not measurably extend the duration of the stop. Subsequently, Rugg obtained information giving rise to a reasonable suspicion of criminal activity involving the transportation of drugs, in addition to the probable cause already developed for the traffic violation, driving without a license, and no proof of insurance. Early on in the encounter, Otero offered Rugg an implausible explanation of his travel, stating that he was traveling to his sister's place in Kansas although he did not know where it was and said it was still 16 hours away – a completely implausible explanation given that one could drive from one corner of Kansas to the opposite corner in around

half that time. Otero was driving without a license (an offense for which he could be arrested in Kansas), Defendants were unable to produce proof of insurance on the vehicle (another arrestable offense), and Rugg was initially unable to confirm that the license plate was validly associated with the BMW. After further inquiry, Rugg was told by Ramos that neither she nor the other female passenger had a driver's license, that she did not know where in Kansas Otero's sister lived, indicated she was unsure of the sister's name, and said they were driving from California to stay at the sister's place for only two days. In total, the circumstances known to Rugg gave him a reasonable suspicion of drug distribution that justified the brief detention that ensued, inquiries about Defendants' identities, the car, and their travel plans; and that made it reasonable to delay Defendants to conduct a dog sniff on the exterior of the BMW.[3]

3. <u>Dog sniff of the interior air space</u>. The evidence shows that in the course of the dog sniff, Rosko lifted up and inserted his snout through the openings where the BMW's windows were lowered, sniffing the interior air space of the vehicle. It also showed that Rosko first detected the odor of controlled substance at the driver's window by inserting his snout into the car's interior airspace in this manner. Ackerman testified that Rosko had been trained to search in this manner. Based on principles discussed below, the court concludes that allowing the dog's entry into the vehicle's interior airspace for the purpose of conducting a sniff of the interior was a search and was unreasonable under the Fourth Amendment.

i. <u>Summary of case law</u>. As this court noted previously, Supreme Court decisions from the last half of the twentieth century tended to characterize a "search" under the Fourth Amendment as having occurred "when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Anderson*, No. 22-10006-JWB, 2023 WL 2140156, at *5 (D. Kan.

---

[3] It is not clear that conducting the dog sniff actually delayed Rugg's pursuit of information related to the stop, but in any event the court finds there was reasonable suspicion justifying a brief delay.

Feb. 21, 2023), *reconsideration denied*, No. 22-10006-01-JWB, 2023 WL 3092583 (D. Kan. Apr. 26, 2023) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984.)) Under this so-called "*Katz* test," the reasonableness of a search was "assessed by balancing the degree of intrusion into an individual's privacy with the need for the search to promote governmental interests." *Id.* (citing *Leatherwood v. Welker*, 757 F.3d 1115, 1120 (10th Cir. 2014) (citing *United States v. Knights*, 534 U.S. 112, 118-19 (2001)). The Supreme Court applied this test in *Illinois v. Caballes*, 543 U.S. 405 (2005), where the Court held that the use of a well-trained narcotics-detection dog on the exterior of a car during a traffic stop "generally does not implicate legitimate privacy interests" and "does not rise to the level of a constitutionally cognizable infringement." *Id.* at 409. *See also United States v. Place*, 462 U.S. 696 (1983) (dog sniff of exterior of luggage in a public place was not a search; sniff did not require opening the luggage, did not expose non-contraband items, and only disclosed presence or absence of contraband). The Court distinguished *Kyllo v. United States*, 533 U.S. 27 (2001), which found the use of a thermal-imaging device on the outside of a house to detect marijuana inside was an unlawful search, noting that the device was capable of detecting both lawful and unlawful activity within the home. By contrast, the Court noted, a dog sniff "reveals no information other than the location of a substance that no individual has any right to possess…." *Caballes*, 543 U.S. at 410.

In *New York v. Class*, 475 U.S. 106 (1986), a police officer reached into a car to move a piece of paper obstructing a VIN. The Court said this intrusion constituted a search. *Id*. at 115. It noted that although the interior of a car is not subject to the same expectations of privacy as a home, "a car's interior as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police." *Id.* at 114. At the same time, the Court found this particular search was reasonable, noting among other things that federal law required that a VIN be placed

in plain view of someone outside the vehicle and that the VIN is a critical part of governmental regulation such that motorists may expect to be required to disclose it. *Id.* at 114 ("The VIN's mandated visibility makes it more similar to the exterior of the car than to the trunk or glove compartment. The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.'") The Court said its ruling, however, did not authorize police officers to enter a vehicle to obtain a VIN when it is visible from outside the car because "there is no justification for governmental intrusion into the passenger compartment to see it." *Id.* at 119.

In *United States v. Ryles*, 988 F.2d 13 (5th Cir. 1993), the Fifth Circuit found that an officer's action in sticking his head into the interior of a vehicle through an open window, where he then smelled marijuana, amounted to a Fourth Amendment search, as it "intruded inside a space that, under most circumstances, is protected by a legitimate expectation of privacy." *Id.* at 15. The court nevertheless found the search was reasonable, as the driver was under the influence of alcohol and the officer was trying to determine whether any passenger could lawfully and safely drive the vehicle.

In 2009, the Tenth Circuit said in an unpublished decision that an officer engaged in a search when he leaned his head about two inches inside an open car window to sniff the interior. The court distinguished *Caballes* on grounds that it involved a sniff of the car's exterior and the dog in that case "did not actually intrude into the car's protected space." *United States v. Montes-Ramos*, 347 F. App'x 383, 389 (10th Cir. 2009). By contrast, "a police officer's intentional act of intruding a vehicle's air space, even if only by a few inches, constitutes a search within the meaning of the Fourth Amendment." *Id*. at 389-90. The court further found the government waived any argument that the search was supported by probable cause and remanded the case for suppression of the evidence. *Id*. at 393.

More recently, the Supreme Court applied a trespass-based Fourth Amendment test for searches that exists as an alternative to the *Katz* privacy-based test. *See United States v. Jones*, 565 U.S. 400, 409 (2012) ("the *Katz* reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test.") In *Jones*, the Supreme Court found that the attachment of a Global Positioning System (GPS) tracking device to the undercarriage of a car to monitor its movements was a search under the Fourth Amendment. The Court said the government "physically occupied private property for the purpose of obtaining information," which would have been considered a search under the Fourth Amendment when it was adopted. *Id*. at 404-05. The Court noted that a car is an "effect" protected by the Fourth Amendment and that Fourth Amendment case law was traditionally tied to common law trespass. The Court found the agents in *Jones* "trespassorily inserted the information-gathering device" on the car and thus engaged in a Fourth Amendment search. *Id*. at 410. The Court explained that a "[t]respass alone does not qualify, but there must be conjoined with that what was present here: an attempt to find something or to obtain information." *Id*. at 408 n. 5. Thus, a "trespass on ... 'effects' ... is not alone a search unless it is done to obtain information; and the obtaining of information is not alone a search unless it is achieved by such a trespass...." *Id*.

*Jones* was followed by *Florida v. Jardines*, 569 U.S. 1 (2013), where the Court found that an officer's use of a drug-sniffing dog on the front porch of a home was a trespassory invasion that constituted a search under the Fourth Amendment. The Court said the curtilage (the area immediately surrounding and associated with the home) is part of the home itself for Fourth Amendment purposes and as such was a constitutionally protected area. The government physically intruded upon that area with a trained dog for the purpose of obtaining incriminating

information, without any implied license to do so, making the search a trespass and objectively unreasonable for Fourth Amendment purposes. *Id*. at 7-8.

ii. Application to the facts. Under the *Katz* test, allowing Rosko to put his snout into the interior of the BMW to sniff for contraband "intruded inside a space that, under most circumstances, is protected by a legitimate expectation of privacy." *Ryles*, 988 F.2d at 15. The court concludes Otero had a reasonable expectation of privacy in the interior of the car, at least insofar as he expected that the interior could not be entered by others without his permission, inasmuch as he had been expressly granted permission by the owner of the car to possess and to use it. *See Byrd v. United States*, 138 S. Ct. 1518, 1527 (2018) ("'One of the main rights attaching to property is the right to exclude others,' and, in the main, 'one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of the right to exclude.'") (citation omitted.) On the other hand, the evidence as to Ramos shows only that she was a passenger who was traveling with Otero. The evidence failed to show that Ramos had any legitimate possessory or other interest that would give her a similar authority to exclude others or that would give her a reasonable expectation of privacy in the vehicle's interior.[4] *Cf. Rakas v. Illinois*, 439 U.S. 128, 148 (1978) (car passenger asserted neither a property nor a possessory interest in the automobile, nor an interest in the property seized, and thus failed to show standing to contest search).

---

[4] The standing question looks at "whether the person claiming a constitutional violation 'has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge.'" *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) (quoting *Rakas v. Illinois*, 439 U.S. 128, 133 (1978)). That issue turns on whether a defendant had a legitimate expectation of privacy in the premises searched. *Id*. This standing inquiry involves two steps: (1) whether the individual had a subjective expectation of privacy in the place and area searched and (2) whether that expectation is objectively reasonable. *United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003). Some ideas that factor into the consideration of a subjective and objective expectation of privacy are whether the individual has the right to exclude others from the property, whether the individual owns the items in the car, whether the individual specifically testified at the suppression hearing that she had an expectation of privacy, and whether the individual showed that she had a legitimate possessory interest in the car. *See id*.; *see also Byrd*, 138 S. Ct. at 1528.

The court finds that Rosko's entry into the car's interior space to sniff for drugs was a search within the meaning of the Fourth Amendment and that it infringed on Otero's reasonable expectation of privacy. *Montes-Ramos* found that "a police officer's intentional act of intruding [into] a vehicle's air space, even if only by a few inches, constitutes a search within the meaning of the Fourth Amendment," 347 F. App'x at 389-90. *Cf. United States v. Taylor*, No. 22-10009-JWB, 2022 WL 17987101, at *8 (D. Kan. Dec. 29, 2022) (officer engaged in search without probable cause when he leaned into car to visually examine label on cough syrup bottle). The same reasoning logically applies to Ackerman's use of Rosko to sniff the interior of the car, as the dog is essentially an instrument of the officer and is subject to the officer's control. Indeed, the testimony here was that Rosko performed the sniff exactly as he had been trained. As such, any argument by the government that the dog's intrusion into the car interior was unintentional or was due to the dog's instinctual actions is refuted by the evidence. In practical effect, the use of a dog is this manner is no different than if the officer had inserted a hand-held tool into the interior airspace of the car to detect odors of contraband. *Monte-Ramos* suggests that such an intrusion, "even if only by a few inches," is a Fourth Amendment search. *Montes-Ramos,* 347 F. App'x at 389.

The facts of this case are thus distinguishable from *United States v. Stone*, 866 F.2d 359 (10th Cir. 1989), where the Tenth Circuit upheld a finding that a dog's "instinctive action" in jumping into the open hatchback of a car, where it detected an odor of drugs, did not violate the Fourth Amendment. The Tenth Circuit noted there was no evidence that the police asked the driver to open the hatchback and no evidence that the police handler encouraged the dog to jump in the car. *Id.* at 364. In support of its "instinctive" finding, the court cited testimony that the officer did not encourage or discourage the dog from entering the car and that he "just let his leash go and let

15

him go where his nose would take him." *Id.* The evidence in the instant case is directly contrary to a finding that Rosko's intrusion into the car interior was due to mere instinct: Ackerman testified the dog had been trained to sniff in exactly this manner. Given that fact, the dog's intrusion into the car interior is attributable to governmental action, not to a circumstance beyond the officer's control. *Stone* thus does not dictate a finding that the search was lawful. And although any constitutional rule that turns upon an assessment of whether a canine's behavior was instinctive or trained seems rather dubious, it is clear that the facts in this case are materially different than those relied upon by the *Stone* panel. Here there was credible evidence that Rosko was trained to engage in the behavior at issue. *Cf. United States v. Winningham*, 140 F.3d 1328, 1331 (10th Cir. 1998) (distinguishing *Stone* in part because "[a] desire [by the officer] to *facilitate* a dog sniff of the van's interior, absent in *Stone*, seems readily apparent here.") (emphasis in original)). *Stone* is also distinguishable on another basis. In *Stone* the district court found that the dog "became interested underneath the [exterior] passenger side of the automobile" before it jumped in the hatchback and "keyed" on that particular spot. *Stone*, 866 F.2d at 363. In *United States v. Parada*, 577 F.3d 1275 (10th Cir. 2009), the court said the *Stone* panel "assumed without deciding that the police only had reasonable suspicion until the dog 'keyed,' *i.e.*, indicated, the exact location of the drugs whereupon officers had probable cause to search." *Id.* at 1281. It said *Stone* therefore did not address the distinction "between a general alert and a pinpoint indication for the purposes of the probable cause analysis." *Id.* at 1281. *Parada* and other Tenth Circuit cases have now made clear that a general alert is sufficient to establish probable cause for a search, and that it is not necessary for a dog to give a final indication of the exact location of the odor source. Thus, if a case like *Stone* were decided today, a dog's general alert on the exterior of the vehicle would be sufficient to establish probable cause for a search of the interior. In the instant case, the court specifically

asked the government to address the point at which the dog first gave an indication or alert that would amount to probable cause. The testimony on that point showed that Rosko engaged in alerting behavior only after and because he sniffed in the car interior through the driver's window and not prior to that point.

The court concludes the dog sniff of the BMW interior was unreasonable because it was not supported by probable cause to believe the vehicle contained drugs. Although it is true that the intrusion here was minimal – the dog's snout entered the interior airspace by no more than a few inches – *Montes-Ramos* indicates there is a bright line when it comes to intruding into the interior space of a vehicle, and a reasonable person possessing an automobile such as this would legitimately expect that others may not freely intrude through an open window into the vehicle's interior air space without some invitation, license, or privilege to do so.  It is also true that a drug-detecting dog only detects contraband that no person has a right to possess, but at the same time reasonable persons have a legitimate expectation that their car interior will not be subjected to governmental searches without cause. Being required to submit to such a search unreasonably infringes that legitimate expectation of privacy and diminishes the individual liberty protected by the Fourth Amendment.

Under binding case law, probable cause is required before the interior of a vehicle may be searched. *See Chambers v. Maroney*, 399 U.S. 42, 48–49 (1970) ("'Having thus established that contraband goods concealed and illegally transported in an automobile or other vehicle may be searched for without a warrant, we come now to consider under what circumstances such search may be made. * * * (T)hose lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or

illegal merchandise. * * * 'The measure of legality of such a seizure is, therefore, that the seizing officer shall have reasonable or probable cause for believing that the automobile which he stops and seizes has contraband liquor therein which is being illegally transported.") (quoting *Carroll v. United States*, 267 U.S.132, 153-54 (1925)). As such, Otero has shown that the dog sniff violated his Fourth Amendment rights.[5] Ramos, however, failed to meet her burden to show standing, and thus has not shown that the dog sniff violated her Fourth Amendment rights.[6]

With respect to the alternative trespass-based Fourth Amendment theory asserted by Defendants, the courts notes that any such theory is problematic, as a trespass to chattels could occur at common law if there was an intentional "intermeddling with a chattel in the possession of another," with "intermeddling" meaning to bring about a physical contact with the chattel. *See* Restatement (Second) of Torts § 217 (1965). The application of that standard to a dog's intrusion into the interior air space of a vehicle is unclear. Regardless, the issue is essentially moot with respect to Otero, as the court has already found under the *Katz* test that the dog sniff violated his Fourth Amendment rights. As for Ramos, the absence of any showing that she had possession of the BMW or the right to exclude others from it likewise refutes any claim that the dog sniff amounted to a trespass against some interest of hers in the car.

---

[5] This bright-line rule against a sniff intruding into the interior of a vehicle would not seem to pose an insurmountable obstacle to conducting a search that conforms to the Fourth Amendment. The record shows no reason why K-9 handlers would not be capable of training or handling their dogs so as to prevent them from entering the interior spaces of vehicles when there is an absence of probable cause or consent to search the interior.

[6] To the extent Ramos may argue that she was unlawfully detained after the dog sniff, the court concludes that any detention of Ramos, a passenger, was not causally connected to the officers' discovery of drugs in the spare tire. *See United States v. Anderson*, 62 F.4th 1260, 1267 (10th Cir. 2023) ("[E]ven if a defendant shows that a detention was impermissibly prolonged, evidence will only be suppressed if he can 'establish a causal link between the violation and the discovery of the contested evidence. … Evidence will not be suppressed as fruit of the poisonous tree unless an unlawful search is at least the but-for cause of its discovery.'") (citations omitted.)

4. <u>Inevitable discovery</u>. The government argues that even if a violation occurred, the drugs found by the officers are admissible under the inevitable discovery rule. For reasons that follow, the court concludes the government has failed to meet its burden to show that the drugs in the spare tire would have been discovered even in the absence of the unlawful dog sniff.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (quoting U.S. Const. amend. IV). In the 20th century, the exclusionary rule became the principal remedy to deter Fourth Amendment violations. *Id.* (citation omitted.) The exclusionary rule bars admission of evidence resulting from a Fourth Amendment violation, unless an exception applies. *See Nix v. Williams*, 467 U.S. 431, 442–43 (1984).

Under Supreme Court precedent, the exclusionary rule encompasses both evidence directly obtained from an unlawful search or seizure and evidence later discovered as a result of the illegality – so-called "fruit of the poisonous tree." *Strieff*, 579 U.S. at 237. But due to the significant costs of the rule, it is "applicable only ... where its deterrence benefits outweigh its substantial social costs." *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (internal quotation marks omitted).

One exception to the exclusionary rule is the inevitable discovery doctrine, which "allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Id.* at 238 (citing *Nix*, 467 U.S. at 443-44). The ultimate or inevitable discovery exception to the exclusionary rule applies when "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means…." *United States v. O'Neil*, 62 F.4th 1281, 1290 (10th Cir. 2023) (quoting *Nix*, 467 U.S. at 444). Those lawful means include an inventory search; if evidence seized unlawfully would have

been inevitably discovered in an inventory search it is admissible. *Id.* at 1290-91. The doctrine is intended to put the police in the same position they would have been in had no police error or misconduct occurred. *Id.* at 1291 (citing *Nix*, 467 U.S. at 443). In assessing the government's burden, we are mindful 'inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification.'" *Id.* (citing *Nix*, 467 U.S. at 444 n.5).

Rugg testified that had the officers not pursued the drug investigation, he would have arrested Otero and would have conducted an inventory search of the car by the roadside before having it towed. The court found Rugg to be a credible witness. But this testimony is not sufficient to meet the government's burden. Given a choice between not pursuing any drug investigation at all, on the one hand, and arresting Otero on the other, Rugg with the benefit of hindsight might well have chosen to arrest Otero. But in applying inevitable discovery the court is to focus on historical facts. The officers' actions at the scene in this case were lawful insofar as they asked questions about whether there were any drugs in the car and then conducted a dog sniff of the car's exterior. The only error or violation shown to have occurred here was in having the dog additionally sniff the interior of the vehicle. Absent that conduct, the evidence indicates the dog likely would have completed its sniff of the car exterior without indicating the presence of any controlled substance. Rugg was not asked what he would have done in that scenario, but the evidence strongly indicates that he only planned to issue a warning to Otero, and thus likely would not have arrested him absent the unlawful search. *Cf. United States v. Souza*, 223 F.3d 1197, 1205 (10th Cir. 2000) (an inevitable discovery analysis "requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred.")

The video evidence showed that when Rugg spoke privately with Ackerman just before the dog sniff – and did so outside of the hearing of the car's occupants – Rugg told Ackerman that he was going to ask for consent to search and was going to run his dog around the car if Ackerman did not use his. He also told Ackerman that he was going to issue Otero a warning. Moments later, as Ackerman proceeded with the dog sniff, Rugg was in fact preparing a warning citation and informed Otero he was only going to issue him a warning for the traffic violation and for driving without a license. Given this evidence, the government has failed to show that the drugs in the trunk inevitably would have been discovered by lawful means through an inventory search. The inevitable discovery rule therefore does not permit use of the unlawfully discovered evidence against Otero.

**IV. Conclusion**

Defendant Otero's motion to suppress (Doc. 29) is GRANTED. Defendant Ramos's motion to join (Doc. 30) is GRANTED, but Ramos's motion to suppress evidence is DENIED.

The court, on its own motion, orders a continuance of the trial until September 11, 2023, based on the foregoing ruling, which significantly alters the evidence that will be admissible at trial and the corresponding need for the parties to prepare accordingly. The court finds that the ends of justice served by this continuance outweigh the best interest of the public and Defendants in a speedy trial. The period of delay caused by this continuance is accordingly excluded from calculation of the speedy trial period pursuant to 18 U.S.C. § 3161(h)(7)(A).


_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE